**IN THE COURT OF APPEALS OF IOWA**

No. 24-1155
Filed November 13, 2025

**TRAVON LAMAR JONES,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Black Hawk County, Melissa Anderson-Seeber, Judge.

An applicant appeals the denial of postconviction relief. **AFFIRMED.**

Erin Carr of Carr Law Firm, P.L.C., Des Moines, for appellant.

Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**BULLER, Judge.**

Travon Jones appeals from the denial of postconviction relief, challenging the effectiveness of trial counsel. He argues counsel was ineffective in failing to timely notice a witness, make an offer of proof, and advise Jones he should have waived speedy trial. Finding Jones has not met his burden to prove ineffective assistance, we affirm.

## I.    Background Facts and Proceedings

A Black Hawk County jury found Jones guilty of first-degree robbery, first-degree burglary, and intimidation with a dangerous weapon with intent. We affirmed on direct appeal, rejecting challenges to sufficiency of the evidence and exclusion of a witness. *State v. Jones*, No. 15-1301, 2017 WL 4570360, at *2–4 (Iowa Ct. App. Oct. 11, 2017). And we summarized the underlying facts, which we repeat here for clarity:

> On about December 19, 2014, there was a fight between Kenneth Weekley and Jonathon Reins at Reins's home, where he was living with his mother, Nicole Fordyce. Reins testified he beat up Weekley. He stated Weekley showed him a gun during this time period. The next day, December 20, Weekley, Darrion Morrissey, and Jones came to Fordyce's home, where Fordyce, Reins, and Marqwane Smith were present. There was an argument between Jones and Reins. Morrissey yelled at Fordyce and gestured at her with his fist. Smith pulled out a gun. Weekley, Morrissey, and Jones then left. Reins testified people were still angry.
>
> On December 22, at about 10:00 p.m., Fordyce heard glass breaking. She looked out of her bedroom and saw Weekley, Morrissey, and Jones creeping up the stairs. Fordyce told Reins and his girlfriend to hide in the bathroom. Jones asked Fordyce, "Where the f*ck is Jon?" but she stated she did not know. Fordyce testified she was afraid because she knew the three intruders sometimes carried guns. She went into her bedroom, locked the door, and called 911. The intruders went into Reins's bedroom and took an Xbox game system, a purse, and a cell phone. They then left the house and got into a white Oldsmobile Alero. From the street, one

of the men fired at least four shots into Reins's bedroom with a .22 caliber handgun, leaving bullet holes in the wall above his bed.

Shortly after midnight, Officer Kenneth Schaaf of the Waterloo Police Department saw the white Oldsmobile Alero at a gas station. After seeing Officer Schaaf, the vehicle left at a high rate of speed. The vehicle, driven by Jones, was eventually stopped. Weekley, Morrissey, and Tyvon Campbell were the passengers in the vehicle. Three .22 caliber shell casings were found in the vehicle. Jones, Weekley, and Morrissey were arrested.

From jail, Jones called his girlfriend and stated, "If you get a chance, have our bro walk down the alley." Morrissey also provided officers with information leading them to discover a .22 caliber handgun hidden behind a trellis in an alley behind Jones's home. Ballistics analysis by the Iowa Division of Criminal Investigation (DCI) showed the shell casings in the vehicle driven by Jones came from the handgun found by officers.

During the criminal trial, Jones testified he did not have a dispute with Reins but stated Weekley and Reins "got into it a few times." He stated he went with Weekley and Morrissey to Fordyce's house on December 20 to "try to keep them out of trouble." Jones stated Reins and Weekley made up but Morrissey and Fordyce began yelling at each other. He testified he went to Fordyce's house with Weekley, Morrissey, and Campbell on December 22 because Smith asked him to meet Smith there and Jones was expecting an argument with Smith. Jones stated he did not know how the glass in the front door was broken. He stated he went inside the home, saw Fordyce, asked her where Reins was, then went back out to the car, which he had driven. Jones also testified he was completely taken by surprise by the gunshots.

*Id.* at *1–2.

We single out the procedural history of the witness-exclusion issue from Jones's direct appeal for a little more discussion. The witness at issue was Morrissey. Six days before trial, defense counsel filed notice of Morrissey as a defense witness. The State moved to exclude Morrissey as untimely noticed, which the court granted. The court indicated it was willing to accept an offer of proof regarding Morrissey's testimony, but no offer of proof was made. On direct appeal, a panel of this court found the district court did not abuse its discretion

when excluding Morrissey but preserved a potential postconviction claim related to counsel's effectiveness on this issue.  *Id.* at *4.

Jones applied for postconviction relief in 2018 advancing a variety of claims. After the withdrawal and appointment of multiple attorneys, the case eventually made its way to trial in 2023.

At the postconviction trial, Morrissey—who was then incarcerated on a parole violation—testified that Jones stayed in the car for the entirety of the 2014 robbery and Morrissey claimed to have told police this before trial.  Morrissey also said he was the one who fired the shots and hid the gun behind Jones's house. Jones admitted that he had made inconsistent statements, lied to police, and "didn't tell the whole truth" on the witness stand at trial.  He also admitted to anticipating there may be a fight when he drove the group to Reins's home. Weekley, called as a witness by Jones, testified that Jones did more than sit in the car: he knocked on the door with the other offenders then went back to the car— "honking the horn, yelling at us to come on"—before hurriedly driving them away from the crime scene after the robbery.  For his part, Jones testified in the criminal case that he went into the house and up the stairs.

Jones's trial counsel also testified regarding his recollection of things with Morrissey in the lead-up to trial.  He recalled that Morrissey had been a codefendant for a long time, there had been discussions about the State calling him as a witness, and they had nearly taken his deposition.  Morrissey spoke with trial counsel after he pled guilty and, once Morrissey offered to testify favorably to Jones, trial counsel filed notice.  Trial counsel also recalled that Jones "was fed up, wanted to have his trial" and was unwilling to waive his right to a speedy trial.

Trial counsel believed he likely had a specific conversation with Jones about this issue but could not recall as of his 2024 postconviction testimony. Aside from his lack of specific recollection, trial counsel was certain that he would not have insisted on going forward with trial on that date "unless [he] knew that Mr. Jones wanted to go to trial." In his words: "my firmness [demanding trial] on the record tells me that Mr. Jones was very firm in not wanting to waive his speedy trial at that point."

The postconviction court found a breach of essential duty for counsel failing to timely notice Morrissey but found the breach did not prejudice Jones. Specifically, the court found that another witness—Campbell—had offered similar testimony at trial, that Morrissey had made inconsistent statements and was "contrary to every other witness in this case," and that overall Morrissey was not a credible witness. The court also observed that Jones had admitted during the criminal trial that he went into the house and knew it was wrong, which conflicted with the core of Morrissey's testimony. For these reasons, the court found Morrissey's testimony would not have been reasonably likely to change the outcome at trial, and the court denied Jones's application for postconviction relief. Jones appeals.

## II.     Standard of Review

We review ineffective-assistance claims de novo. *Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A

postconviction applicant claiming ineffective assistance must prove both (1) counsel's performance fell below objectively reasonable standards and (2) if counsel had acted differently, there would have been a reasonable probability of a different outcome at trial. *Id.* at 687–88, 694.

### III. Discussion

Following the postconviction court's lead, we assume without deciding that counsel breached a duty regarding the untimely notice of Morrissey as a witness, and we focus our review on prejudice. Although we do not disagree with the district court's detailed analysis explaining the strength of the trial evidence and why the evidence of Jones's guilt was compelling, we think the resolution of this issue can be more straight-forward. As an aider and abettor, Jones's conduct driving the getaway car was sufficient to warrant conviction given his knowledge that the other offenders had perpetrated a robbery. *See, e.g.*, *State v. White*, No. 06-1810, 2007 WL 4322325, at *5 (Iowa Ct. App. Dec. 12, 2007) ("Driving a getaway vehicle can constitute substantial evidence that a crime was committed with the driver's 'knowledge and encouragement' and thus support convictions on the theory of aiding and abetting." (citation omitted)). As a result, Morrissey's testimony that Jones stayed in the car would not have undermined the sufficiency of the State's evidence and engenders no reasonable probability of a different outcome, even if believed in whole or in part. To the extent this alone does not answer the prejudice question, we also agree with the postconviction court's observation that Morrissey's testimony was inconsistent with every other witness in the case, including the version of events Jones gave at trial, and thus Morrissey's testimony was not reasonably likely to result in acquittal.

Jones additionally argues that trial counsel was ineffective for not making an offer of proof regarding Morrissey's testimony. We are unsure what the offer of proof would have achieved. It would not have changed the court's exercise of discretion, because Jones does not cite—nor are we aware of—any case law suggesting witnesses may be untimely noticed based on the usefulness of their testimony. It would not have affected the direct appeal for the same reason. And to the extent the content of Morrissey's testimony is relevant to postconviction relief for purposes of our prejudice analysis, Morrissey testified at the postconviction trial, and we are not left guessing as to what he would have testified. We discern neither breach nor prejudice on this ground.

Last, Jones appears to claim counsel was ineffective for not advising him to waive his right to a speedy trial and thus potentially re-set the deadline for noticing witnesses. But trial counsel testified that Jones "was fed up, wanted to have his trial," and was unwilling to waive speedy trial. The record supports that observation. And the postconviction court as factfinder expressly found that trial counsel "discussed with Jones about re-waiving his right to a speedy trial, but Jones maintained his right to proceed to trial within ninety days." Under supreme court precedent, counsel is not ineffective for honoring his client's wish for a speedy trial. *See Trane v. State*, 16 N.W.3d 683, 692–93 (Iowa 2025). And even if Jones had waived speedy trial and we assume Morrissey was allowed to testify, Jones still would not be able to prove prejudice for the reasons we have already discussed with regard to his other claims.

**AFFIRMED.**